**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| NITA PATEL, | : | |
| | : | Civil Action No. 17-7485 (SDW) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| | : | |

APPEARANCES:

CAROLINE CINQUANTO, Esq.
Law Firm of Caroline Goldner Cinquanto
123 S. Broad Street, Suite 2500
Philadelphia, PA 19109

MARK E. CEDRONE, Esq.
JESSE DAVID ABRAMS-MORLEY, Esq.
Cedrone & Mancano, LLC
230 S. Broad Street, Suite 1100
Philadelphia, PA 19102
            On behalf of Petitioner

NICOLE F. MASTROPIERI, Assistant United States Attorney
United States Attorney's Office
970 Broad Street
Newark, NJ 07102
            On behalf of Respondent

**WIGENTON**, District Judge

Presently before the Court is Petitioner Nita Patel's ("Ms. Patel") amended motion to vacate

sentence under 28 U.S.C. § 2255, challenging her criminal conviction and sentence upon her guilty

plea to health care fraud in violation of 18 U.S.C. §§ 1347 and 2, in Criminal Action No. 15-592.[1]

(ECF No. 4).   Ms. Patel alleges her counsel provided ineffective assistance from pre-plea

investigation throughout sentencing.   The Government filed an answer to the amended § 2255

motion (ECF No. 27), and Ms. Patel filed a reply brief (ECF No. 53).   Subsequently, Ms. Patel

filed a supplemental motion for hearing (ECF No. 54), and the Government did not respond.   For

the reasons set forth below, this Court will deny the amended § 2255 motion on the briefs pursuant

to Federal Rule of Civil Procedure 78(b), and deny the supplemental motion for an evidentiary

hearing.

## I.   BACKGROUND

Ms. Patel and her husband, Kirtish Patel ("Kirtish" or "Mr. Patel"), pled guilty to federal

health care fraud involving Medicare and private insurers, through a scheme in which they

forged physician signatures to create false diagnostic reports purportedly written by physicians

who had read and interpreted the results, and by false pretenses claiming neurological diagnostic

tests were supervised by a physician.[2]   (Crim. ECF No. 30 at 1).   According to the stipulation in

---

[1] Docket Entries in Criminal Action No. 15-592 are cited herein as ("Crim. ECF No."), and
docket entries in this Civil Action, No. 17-7485, are cited herein as ("Civ. ECF No.")

[2] "Medicare regulations require all diagnostic testing to be 'reasonable and necessary,'  as defined
under Medicare Part B.  In order for diagnostic neurological testing to be 'reasonable and
necessary,' it must be performed under the proper level of physician supervision."
*United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 311 (3d Cir. 2019) (citing 42 U.S.C. §
1395y(a)(1)(A), 42 C.F.R. § 410.32(b)(1); 42 C.F.R. § 411.15(k).)  In her reply brief, Ms. Patel
maintains that her counsel failed to advise her that private insurance companies are not governed
by the Medicare regulation requiring supervision by a neurologist.  Although this is not
addressed in the record, this Court notes that medical diagnostic testing is also governed by New
Jersey law:

> medical screening or medical diagnostic testing (other than clinical
> laboratory testing), conducted primarily for persons not receiving
> medical treatment from the testing entity, is nevertheless deemed
> to be a medical service. Such a practice shall be owned and under

the plea agreement, as a result of the health care offense, the Patels, through their companies,

Biosound Medical Services, Inc. ("Biosound") and Heart Solution, PC ("Heart Solution"), were

paid more than $4,386,133.75, with payments from Medicare accounting for $1,668,954.95 of

the total amount.  (Crim ECF No. 30 at 9).

A.      **The Information**

On November 17, 2015, Ms. Patel was charged by Information with defrauding Medicare

and private insurers from in or about September 2006 through in or about June 2014, in Morris

County, New Jersey, in violation of 18 U.S.C. §§ 1347 and 2.[3]  (Crim. ECF No. 26).  The factual

---

the responsibility of one or more physicians each of whom holds a
plenary license from the State Board of Medical Examiners. All
such testing, irrespective of the stationary or mobile nature of the
facility, shall be performed under the authority of a designated
responsible physician who shall establish a protocol and a quality
assurance program for the specific type of screening or study.
Results of all such procedures shall be interpreted by a physician
holding a plenary license in this State, and documented in a written
report which is preserved by the physician as required by N.J.A.C.
13:35–6.5.

*Allstate Ins. Co. v. Northfield Med. Ctr.*, P.C., No. MRS-L-3228-99, 2001 WL
34779104, at *15–16 (N.J. Super. Ct. Law Div. Apr. 27, 2001); *see, e.g.*,
*Allstate Ins. Co. v. Schick*, 328 N.J. Super. 611, 628, 746 A.2d 546, 556 (Law.
Div. 1999) (denying summary judgment where evidence suggested physician
agreements were a sham that falsely represented compliance with state
regulations).  Thus, private insurance companies in New Jersey have an
expectation that diagnostic testing was performed in accordance with the law.
Notwithstanding, Ms. Patel knowingly and voluntarily pled to the factual basis, as
outlined on the record and under oath.

[3] 18 U.S.C. § 1347(a), (b) provides:

Whoever knowingly and willfully executes, or attempts to execute,
a scheme or artifice--

(1) to defraud any health care benefit program; or

allegations in the Information are summarized as follows. Ms. Patel owned the business Heart

Solution, and her husband owned Biosound. The Patels jointly operated both businesses and

neither of them was a physician. Both businesses offered mobile diagnostic testing services that

were conducted on-site at a physician's office. Biosound was a Medicare-approved provider

since 1999, and Heart Solution was a Medicare-approved provider since 2011.

Private insurance companies and Medicare reimbursed Biosound for the performance and

interpretation of tests ordered by a patient's primary care physician for diagnosis and treatment

including: 1) echocardiograms to diagnose heart conditions; 2) chest, abdominal and lower leg

ultrasounds to detect blood clots and abdominal aortic aneurysms; and 3) carotid ultrasounds to

detect the risk of stroke. To receive reimbursement for these services, Medicare required

Biosound to have a licensed subspecialist physician on staff to supervise and interpret any test

performed in a particular subspecialty. Biosound purported to comply by Kirtish Patel travelling

---

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.

(b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

18 U.S.C. § 2(a) states, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

4

with the testing equipment to the referring physician's office to perform the tests, and then he would send the results to a specialist physician (the "Reading Doctor") to interpret the results and author and sign a diagnostic report.

Beginning at least as early as October 2008, the Patels stopped transmitting the test results to a Reading Doctor. Instead, Mr. Patel, with no medical license, wrote the diagnostic reports, and Ms. Patel copied and pasted physicians' signatures on the diagnostic reports from Biosound's office. The diagnostic reports were returned to the referring physicians, who made treatment decisions for their patients. The Patels forged Reading Doctors' signatures on more than half of the diagnostic reports produced by Biosound in the relevant period, without the knowledge of those doctors whose names were misappropriated. Biosound employees became aware of this scheme.

Beginning in or around September 2006, Mr. Patel represented to Medicare that Biosound would begin performing neurological diagnostic tests, which would be supervised by a physician as required by Medicare. Based on this false representation, Biosound became a Medicare-approved provider of neurological diagnostic testing. "From in or around September 2006 through June 2014, none of the neurological testing performed by Biosound was supervised by the neurologist that Kirtish N. Patel indicated to Medicare was supervising Biosound's neurological testing." (Crim. ECF No. 26 at 6).

By way of this scheme to defraud, the Patels were paid more than $4,386,183.75 by Medicare and private insurance companies. The Information also called for forfeiture, pursuant to 18 U.S.C. § 982(a)(7), of all property derived from gross proceeds traceable to the commission of the offense, for which the Patels are jointly and severally liable.

**B.     The Plea Agreement**

On August 20, 2015, Ms. Patel entered into a written plea agreement with the Government.  (Crim. ECF No. 30).  Pursuant to the plea agreement, Ms. Patel pleaded guilty to the Information described above.  In exchange for Ms. Patel's guilty plea, the Government agreed not to initiate any further criminal charges against her for forging physician signatures or obtaining health care benefits under false pretenses for the period from September 2006 through June 2014.  The plea agreement stated that:  (1) the statutory maximum term of imprisonment was ten years; (2) the statutory maximum fine was the greatest of $250,000, or twice the gross amount of any pecuniary gain that any persons derived from the offense, or twice the gross amount of any pecuniary loss sustained by any victims of the offense; (3) in addition to any fine, the sentencing court must order forfeiture pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461; and (4) may order restitution.  The Government did not make any promise as to the Sentencing Guidelines range or the ultimate sentence.  As to forfeiture and restitution, the parties agreed it would be equivalent to the amount of the loss involved in the criminal conduct pursuant to U.S.S.G. § 2B1.1(b)(1), as determined by the sentencing judge.

Ms. Patel agreed with the Government, but reserved argument before the sentencing judge as to the loss amount, that the Patels were paid more than $4,386,133.75 by Medicare and the insurance company victims of the scheme to defraud.  This stipulation did not bind the sentencing judge, and it did not bind the Government to the extent that the Government obtained, prior to sentencing, any conflicting credible, material information on losses.  Ms. Patel acknowledged in writing that she discussed the plea agreement with her attorney. She further

acknowledged that she read the plea agreement and wanted to plead guilty.  The written plea

agreement precluded Ms. Patel from obtaining the benefits of the agreement in the event that:

> a guilty plea in this matter is not entered for any reason or the
> judgment of conviction entered as a result of this guilty plea does
> not remain in full force and effect, NITA PATEL agrees that any
> dismissed charges that are not time-barred by the applicable statute
> of limitations on the date this agreement is signed by NITA
> PATEL may be commenced against her, notwithstanding the
> expiration of the limitations period after NITA PATEL signs the
> agreement.

**C.       The Plea Hearing**

On November 17, 2015, Ms. Patel entered a guilty plea before the late Honorable

William H. Walls, U.S. District Judge.  (Crim. ECF No. 31).  At her plea hearing, Ms. Patel was

accompanied by her attorney, Frank Arleo, Esq. ("Arleo"), and an interpreter.  (*Id.* at 3).  Judge

Walls stated, "if I say anything that does not accord with your understanding, please let me

know."  (*Id.* at 10).  Ms. Patel confirmed that (1) she had no obligation to plead guilty; (2) she

understood her right to have the matter referred to a grand jury, and, if indicted, she had the right

to a jury trial, with a presumption of innocence; (3) her attorney had negotiated the plea

agreement with her knowledge and consent; (4) she understood she could receive up to a 10-year

prison sentence; (5) she waived her right to a jury trial and retained only a limited right to appeal

the sentence; and (6) she would be required to pay restitution and was exposed to a forfeiture

order.  (*Id.* at 5-6, 8-10).  Judge Walls explained the sentencing procedure:

> Whatever sentence that you will get, Mrs. Patel, will be up to me,
> and it will be my exercise of my discretion to give you a
> reasonable sentence. To do so, I'll listen to what Mr. Arleo, your
> attorney, may say on your behalf. I'll listen to whatever you may
> wish to say. I'll listen to whatever the Assistant United States
> Attorney may wish to say. I shall read a presentence investigation
> report by the Probation Department….

(Crim. ECF No. 31 at 10-11).

Ms. Patel agreed to have a forfeiture money judgment entered against her, equal to all property and money that she obtained directly or indirectly from gross proceeds traceable to the crimes to which she pleaded guilty, equal to the loss amount involved with the criminal conduct. (Crim. ECF No. 31 at 12).  If Ms. Patel and the Government could not agree as to that amount, it would be determined by the sentencing judge.  (*Id.*)  Judge Walls further advised Ms. Patel, and she confirmed that:

> This agreement is only between you and this United States Attorney for this District of New Jersey. It is not binding on any Federal, local, or state law enforcement agency, nor is it binding upon any civil authorities or any third party from bringing any administrative or civil actions against you.

(*Id.* at 17).   She understood that she had a right to bring a collateral attack based on ineffective assistance of counsel, but she was satisfied with Mr. Arleo's representation up to that point.  (*Id.*)  No one had threatened her or made any promises to induce her to accept the guilty plea.  (*Id.* at 18).

Judge Walls went over the stipulations in the plea agreement with Ms. Patel to determine that she understood.  Ms. Patel understood that she stipulated to receiving more than $4,386,133.75 from Medicare and private insurance companies for false diagnostic reports that were purportedly written by actual physicians, and neurological diagnostic reports for which there was no supervising physician.  (*Id.* at 18-19).  The amount the Patels received from other unnamed payors would be calculated later in the same manner.  (*Id.* at 19).

To provide a factual basis for the plea, Ms. Patel answered as follows:

> THE COURT:  . . . We are talking about the period of 2006 to 2014, Mrs. Patel. At that time, and during that time, did you and your husband own and operate mobile diagnostic companies known as Biosound Medical Services and Heart Solution PC?
>
> THE DEFENDANT:  Yes.

THE COURT: Where were they located?

THE DEFENDANT: (In English) Parsippany.

THE COURT: And during that time in Parsippany,
did those two companies provide diagnostic testing services
to Medicare patients?

THE DEFENDANT: (In English) Yes.

THE COURT: And did you bill Medicare for those testing services
that you claimed to have provided?

THE DEFENDANT: (In English) Yes.

THE COURT: And did part of that diagnostic work
that you purported to provide include having licensed
specialist physicians review and interpret the diagnostic
values that were recorded by a diagnostic technician such as
yourself and your husband?

THE DEFENDANT: Yes.

THE COURT: And during that time, did you know
that the doctors who ordered the diagnostic services relied
upon those reports, which they believed were prepared by
licensed specialist physicians, in order to make important
treatment decisions for their patients?

THE DEFENDANT: Yes.

THE COURT: And during this period of between
October 2008 to June 2014, did you and your husband decide
without his having any medical license that he would
write many of the diagnostic reports that were supposed to
be written by a licensed specialist physician?

THE DEFENDANT: (In English) Yes.

THE COURT: And when your husband so fraudulently interpreted
and wrote a diagnostic report, did you then attach a forged
specialist physician's signature to that report to make it appear that
an actual physician had authored the report?

THE DEFENDANT: (In English) Yes.

THE COURT: And were these forged diagnostic
reports intended to assess a person's or patient's risk of
serious medical condition, such as blood clots, health
defects, abdominal aortic aneurysms, and stroke?

THE DEFENDANT: Yes.

THE COURT: Did you know what you were doing at
this time?

THE DEFENDANT: (In English) Yes.

THE COURT: And did you do so willingly and
knowingly? (Off the record discussion between the Defendant and
defense counsel)

THE DEFENDANT: Yes.

THE COURT: All right. Now, during this period of
2006 through 2008, did you and your husband falsely --

MS. WALSMAN: You just said the wrong year, Your
Honor. 2006 through 2014.

THE COURT: Did you and your husband falsely
represent to Medicare that the neurological testing being
performed at Biosound Medical Services was being supervised
by a licensed neurologist, when, in fact, it was not?

THE DEFENDANT: Yes.

THE COURT: Were your companies, Biosound Medical
Services and Heart Solution, PC, paid more than
$4,386,133.75 by Medicare and private insurance companies
for claims submitted for diagnostic testing and reports that
were never interpreted by a licensed physician and for
neurological diagnostic testing that was never supervised by
a licensed neurologist?

THE DEFENDANT: Yes.

THE COURT: And were your companies, Biosound
Medical Services and Heart Solution, PC, paid at least
$1,668,954.95 by Medicare for claims submitted for
diagnostic testing and reports that were never interpreted

10

by a licensed physician and diagnostic neurological testing
that was never supervised by a licensed neurologist?

THE DEFENDANT: Yes.

THE COURT: And did you know that what you and
your husband were doing by submitting these claims to
Medicare was illegal?

THE DEFENDANT: (In English) Yes.

THE COURT: And are you pleading today to this
charge because, in fact, you are guilty of the charge?

THE DEFENDANT: (In English) Yes.

THE COURT: Are you satisfied, Mr. Arleo?

MR. ARLEO: I am, Your Honor.

THE COURT: Ms. Walsman?

MS. WALSMAN: Yes, Your Honor.

THE COURT: Have you signed the application to
enter a plea of guilt and waiver of indictment in this
matter, Mrs. Patel?

THE DEFENDANT: Yes.

THE COURT: Before you signed these documents, did
you read them?

THE DEFENDANT: Yes.

THE COURT: Do you understand them?

THE DEFENDANT: Yes.

THE COURT: Do you have any questions that you
wanted answered by Mr. Arleo that he has not answered?

THE DEFENDANT: (In English) No.

THE COURT: Do you have any questions of anything
that you want to ask me?

THE DEFENDANT: (In English) No.

THE COURT: All right. I'll accept your plea. . . .

(Crim. ECF No. 31 at 22-26).

**D.      The PSR**

The U.S. Probation Department prepared Ms. Patel's presentence report ("PSR").

According to the PSR, pursuant to 18 U.S.C. § 3664(d)(1), the government consulted with all

identified victims and provided the Probation Office with a listing of the amounts subject to

restitution.  (PSR, ¶ 39).  In this regard, the PSR contained a list of insurance company victims

including "Payor Group A" reporting a total loss of $4,386,175.75 (*Id.*, ¶ 32), and "Payor Group

B" reporting a total loss of $417,741.65.  (*Id.*, ¶ 33).  Each of the 23 insurance companies,

including Medicare, confirmed their losses and provided contact information.  (*Id.*, ¶¶ 40, 41).

Regarding the cardiology reports (exclusive of echocardiograms), the Government

learned that not all of the reports were false.  (*Id.*, ¶ 32).  The Government subpoenaed

Biosound's 2012-2014 cardiology reports from the referring doctors, and then compared them

against records from the Reading Doctors, who had identified the reports they had actually

reviewed and authored.  (*Id.*)  From this review by the Government, it was reasonably

determined that 75% of the records reviewed were false reports with forged doctor signatures.

(*Id.*)  The Probation Office adopted this calculation and added 75% of the insurance companies'

payments for cardiology tests to the payments for the neurological tests, arriving at the total loss

for each victim.  (*Id.*)

The Probation Office calculated the offense level using the November 1, 2015 Guidelines Manual.[4]  (PSR, ¶ 28).  U.S.S.G. § 2B1.1 is the relevant Guideline for loss calculations under 18 U.S.C. § 1347.  Under Application Note 1 to  § 2B1.1, "Federal health care offense" includes offenses against private insurance plans and "Government health care program" includes Medicare.

Application Note 3 governs "Loss Under Subsection (b)(1)," and provides, in relevant part:

> (A) General Rule.—Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.
>
> > (i) Actual Loss.—"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
>
> . . .
>
> (C) Estimation of Loss.—The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. See 18 U.S.C. § 3742(e) and (f).
>
> The estimate of the loss shall be based on available information….
>
> (E) Credits Against Loss.—Loss shall be reduced by the following:
>
> > (i) . . . the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.
>
> . . .
>
> (F) Special Rules.—Notwithstanding subdivision (A), the following special rules shall be used to assist in determining loss in the cases indicated: . . .
>
> > (v) Certain Other Unlawful Misrepresentation Schemes.— In a case involving a scheme in which services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; . . . loss shall include the

---

[4]  Available at https://www.ussc.gov/guidelines/guidelines-archive/2015-guidelines-manual.

> amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

With this background, the Probation Office started with a base offense level of 6, pursuant to § 2B1.1. (PSR, ¶ 50). The base offense level was increased by 18 points because the loss was at least $4,386,133.75. (PSR, ¶ 50). Two points were added, pursuant to § 2B1.1(b)(2)(A) for 10 or more victims. (*Id.*, ¶ 51). Two points were added pursuant to § 2B1.1(b)(7)(A)(B)(i), because the offense was against Medicare, and the loss to Medicare was more than $1,000,000. (*Id.*, ¶ 53). Two more points were added pursuant to § 2B1.1(b)(15)(A), because the offense involved the conscious or reckless risk of death or serious bodily injury. (*Id.*, ¶ 54). This resulted in an offense level of 30. (*Id.*, ¶ 58). Three points were deducted for acceptance of responsibility, pursuant to § 3E1.1(a), (b). (*Id.*, ¶¶ 60, 61). This brought the total offense level to 27. (*Id.*, ¶ 62).

In determining the loss amount of $4,386,133.75, the Probation Office applied Application Note 3(F)(v) to § 2B1.1, because the Patels represented to the insurance companies that the diagnostic reports were reviewed and authored by appropriately licensed physicians, but Kirtish Patel reviewed and authored the reports himself, and he was not a physician. (*Id.*, ¶ 32.) Application Note 3(F)(v) does not permit credit against the loss amount for the value of the services provided by defendants who falsely pose as licensed professionals. (*Id.*)

Ms. Patel was interviewed by the Probation Office, and the PSR describes her employment record, without specifying the dates:

> Nita Patel had been employed as the manager of Biosound Medical Services and owned Heart Solution[], both collectively located in Parsippany, New Jersey, and performing the same services. She reported earning a gross monthly salary of $3,750.

(*Id.*, ¶ 87).

**E.      Ms. Patel's Sentencing Memorandum**

In Ms. Patel's sentencing memorandum, Mr. Arleo challenged the Government's position that she should not receive the three offense level reduction for acceptance of responsibility. (Civ. ECF No. 27 at 189-92).  He explained that in a related civil action under the False Claims Act, Ms. Patel had argued that in 2006-2007, her husband paid Brad Tinkelman M.D. to serve as a neurological supervisor for Biosound.  (Civ. ECF No. 27 at 191.)  Admittedly, Dr. Tinkelman received no money after 2007, and her husband hired a new neurological supervisor in 2012. (*Id.*)  Mr. Arleo argued this was not inconsistent with Ms. Patel's guilty plea because she admitted that Biosound did not have neurological supervision for some time between 2008 and 2014.  (*Id.*)

Further, Mr. Arleo asserted that Ms. Patel was not the owner of Biosound.  (*Id.*)  Thus, she had no legal obligation to comply with Medicare regulations that required Biosound to have a neurological supervisor.  (*Id.*)  She was merely an employee of Biosound, who had returned to employment after her children were grown.  (*Id.*)  Mr. Arleo posited that Ms. Patel should not be punished for the Government's sloppy drafting of factual basis questions for her plea hearing, where she was "lumped together with Kirtish" and held responsible for fraud by Biosound from 2006 through 2014.  (*Id.* at 192).  He submitted that Ms. Patel never wavered from taking responsibility for forging signatures on diagnostic tests without having a Reading Doctor interpret the results. (*Id.*)  Throughout the plea negotiations, the defense had always asserted that Biosound paid Dr. Tinkelman as a neurological supervisor for some period of time.  (*Id.*)  Ms. Patel only agreed to provide the factual basis for her plea because her attorney advised her that the neurological supervision they allegedly provided for Biosound's performance of diagnostic neurological tests probably did not satisfy Medicare's requirements.  (*Id.*)

Mr. Arleo challenged the loss calculation submitted by the Government and Probation Office, arguing they had conflated the conduct of Ms. Patel with her husband, instead of making individual determinations of responsibility. (*Id.* at 193-95). Kirtish Patel owned Biosound, while Nita Patel owned Heart Solution. (*Id.* at 195). The facilities operated as separate entities and were situated in different locations. (Civ. ECF No. 27 at 195). As the owner and operator of Biosound, Kirtish Patel was responsible for ensuring that the tests performed at his facility were conducted with the appropriate level of supervision. (*Id.*) This case did not involve any unsupervised diagnostic testing at Heart Solution, owned by Ms. Patel. (*Id.*) Even assuming Ms. Patel was aware of the lack of supervision over the neurological testing by Biosound, she played no role in the management of that facility. (*Id.*) The loss attributable to the unsupervised neurological testing at Biosound, $2,265,196.00, should be subtracted from the loss figure used to calculate Ms. Patel's offense level. (*Id.*)

Mr. Arleo sought further reduction from Ms. Patel's total loss amount by way of credit for the services Biosound and Heart Solution provided to Medicare and the private insurance companies. (*Id.* at 196). He explained that the companies provided the diagnostic tests and preliminary reports, but they failed to have physicians read the results and interpret the results. (*Id.*) The customary fee for a "Reading Doctor" was $25.00 per report. (*Id.*) Adding these fees for each report resulted in a total loss under $100,000. (*Id.*) This would reduce the offense level by 10 points. (*Id.*)

In addition to challenging the Government's and Probation Office's loss calculations, Mr. Arleo also sought a downward departure based on: (1) Ms. Patel's lack of a management role in the administration of Biosound's services, (2) the lack of any actual or intended physical harm resulting from her criminal conduct; (3) the unlikelihood she would recidivate; and (4) due to her

16

serious health issue. (*Id.* at 196-98). Under the 18 U.S.C. § 3553 sentencing factors, Mr. Arleo argued that Ms. Patel was otherwise a good, charitable person, and none of the patients were harmed by the scheme to defraud. (*Id.* at 199-204).

**F.     Ms. Patel's Sentencing Hearing**

At Ms. Patel's sentencing hearing on August 16, 2016, Mr. Arleo challenged the recommended offense level of 27 in the PSR. (Civ. ECF No. 27 at 66-69). The parties disputed whether there should be an 18 point increase based on the loss amount. (*Id.* at 67-69). Although Ms. Patel had stipulated with the Government that Biosound and Heart Solution received $1,668,954.95 from Medicare as a result of the scheme to defraud, this was not a binding stipulation of the loss amount at sentencing. (*Id.* at 69).

Mr. Arleo explained that the roughly $4.3 million loss stipulation was split more or less evenly between two types of conduct, the Reading Doctor forgeries and the lack of appropriate supervision of neurological diagnostic tests by Biosound. (*Id.* at 70). Mr. Arleo contended Ms. Patel was not responsible for a neurologist's supervision over Biosound's neurological testing because she was not the owner. (*Id.*) If the Court accepted this argument, it would cut in half the roughly $4.3 million loss stipulated by the parties in the plea agreement, and reduce the offense level by two points. (*Id.* at 70-71.) The Government's position was that Ms. Patel was nonetheless responsible because the Patels were husband and wife, and she was an employee of Biosound. (*Id.*) Mr. Arleo contended this was not relevant—and she had no legal obligation to assure proper supervision over diagnostic testing. (*Id.* at 71-73).

Mr. Arleo also challenged the forgery portion of the total loss amount. (*Id.* at 73). All diagnostic tests were performed and preliminary reports were prepared. (*Id.* at 74). What was

lacking was review and interpretation by appropriately licensed physicians.  (*Id.*)  Biosound and

Heart Solution typically paid $25 per test to the Reading Doctors.  (*Id.*)  Thus, the loss to the

insurance companies was the portion that would have been paid to the Reading Doctors.  (*Id.*)

Judge Walls, however, responded:

> I could care less whether the work was physically done. The result
> was fraudulent. Fraudulently induced. And here you take a test
> which involves serious matters, such as ultrasounds and other tests
> which determine whether people are suffering from serious
> illnesses, not just a cough, and it's sent supposedly to a reading
> physician but, in fact, it's not…. are you saying you are going to
> try to apportion this?

(Civ. ECF No. 27 at 76).  Mr. Arleo stood firm, noting that no one suffered death or injury.  (*Id.*)

Judge Walls corrected him by adding "that we know of."  (*Id.*)  Mr. Arleo explained that when

Ms. Patel was interviewed by the FBI, she indicated that approximately 5,000 tests were

performed over the relevant period of time.  (*Id.* at 78-79.)  The Patels cooperated in mitigating

any potential harm by providing the Government with a list of all the patients affected by the

reports, so that the patients could be alerted and seek retesting.  (*Id*.)  No harm was discovered.

Next, Mr. Arleo addressed the Government's objection to a three offense level deduction

for acceptance of responsibility, based on Ms. Patel's attempt, in a related civil case, to contest

her liability for conduct to which she had pleaded guilty.  (*Id.* at 79).  Mr. Arleo explained that in

Mr. Patel's proffer statement to the FBI, he claimed to have hired Dr. Brad Tinkelman, through

an intermediary, Rob Lavin, as Biosound's neurological supervisor.  (*Id.* at 81-82).  Mr. Patel

sent Lavin a check to pay Dr. Tinkelman.  (*Id.* at 82).  One year later, the defense was unable to

obtain a copy of the check from the bank.  (*Id.*)  The Government had questioned Dr. Tinkelman,

who denied knowing anything about the Patels.  (*Id.* at 82-83).  The defense was unable to find

Dr. Tinkelman.  (*Id.*)  Nonetheless, prior to the plea hearings, Mr. Arleo told the Government

that the Patels would not agree that they had never hired a neurological supervisor for Biosound. (*Id.* at 83). Thus, the Government changed the factual basis question to allow the Patels to plead consistent with their claim that they hired Dr. Tinkelman as a neurological supervisor, but that Dr. Tinkelman did not provide the supervision required by Medicare regulations. (Civ. ECF No. 27 at 83-84). The Patels accepted the revised question for the plea hearing on the advice of their attorneys. (*Id.* at 86-87).

Mr. Arleo also sought a downward departure at the sentencing hearing. He submitted that Ms. Patel took responsibility for her role in the forgeries. (*Id.* at 92). However, her offense level overrepresented her role in Biosound because she was only a "worker bee," who was not responsible for hiring a supervisor. (*Id.* at 93-96). Mr. Arleo also sought a downward departure based on Ms. Patel's illness and the Bureau of Prison's inability to provide adequate medical care. (*Id.* at 96-100). He further addressed the sentencing factors under 18 U.S.C. § 3553, arguing that no one died or was injured as a result of the fraud. (*Id.* at 100). However, Judge Walls expressed his view that the Patels deliberately and callously risked misdiagnosing patients, which could have resulted in death. (*Id.* at 101). Mr. Arleo contended the Patels had already accepted responsibility for the risk of death or injury by stipulating to a  2-point increase in the offense level. (*Id.* at 102.) Ms. Patel was a good person who made a mistake and deserved leniency. (*Id.* at 102-3). Judge Walls disagreed because the fraudulent scheme lasted for years. (*Id.* at 103).

The Government contested Mr. Arleo's claim that $2.2 million of the total loss was based solely on having no supervision for neurological testing because there were forged Reading Doctor signatures on neurological reports as well. (*Id.* at 106). The Government did not go through the neurological tests one by one to determine which contained forged physician

signatures because none of the neurological tests were supervised by a neurologist, thus all were part of the scheme to defraud. (*Id.* at 106-7). For the cardiology tests, which were not subject to the supervising neurologist regulation, the Government subpoenaed the referring physicians for all cardiology diagnostic reports from Biosound in 2012 through June 2014. (*Id.* at 107). The Government asked each physician whose name was forged to identify which reports they had actually reviewed for Biosound and Heart Solution, and compared the difference from the total tests and those that were properly read by a physician. (Crim. ECF No. 27 at 107). This is how the Government determined that 75% of the cardiology reports, exclusive of the echocardiograms, were forged. (*Id.* at 107-8).

The Government, however, also spoke with neurologists whose signatures appeared on the neurology reports. (*Id.* at 108). Several neurologists confirmed they had stopped reading reports for Biosound, but their names continued to appear on scores of reports. (*Id.* at 108). On the day of her arrest, Ms. Patel estimated there were approximately 5,000 fraudulent tests at issue, but when the Government subpoenaed the referring doctors they received 14,000 tests. (*Id.* at 114-15). Holding Ms. Patel responsible for losses from only 10,500 tests was a conservative estimate, the Government claimed, because they did not subpoena every doctor whose name was forged by the Patels after the doctor stopped reading tests for them. (*Id.* at 115).

In opposition to the departure motion, the Government argued that patients who potentially had serious illnesses were put at risk, and therefore, the offense level could not overrepresent the conduct. (*Id.* at 113-15). The Government asked for an upper Guidelines range sentence, without a deduction for acceptance of responsibility. (*Id.* at 118).

Judge Walls adopted the offense level calculation from the PSR and awarded the three level reduction for acceptance of responsibility. (*Id.* at 121-23). He determined the loss amount was the stipulated amount in the plea agreement, and added $417,000, which the Government subsequently discovered was paid by another group of insurance companies. (*Id.* at 124-25). Per the plea agreement, the loss amount would also dictate the forfeiture and restitution. (*Id.*) Judge Walls found a total loss of $4,803.875.40, and the same amount for restitution, and he waived a fine. (Civ. ECF No. 27 at 110-13, 121-28). Judgment was entered on August 16, 2016. (Crim. ECF No. 39). Ms. Patel was (1) sentenced to a 78-month term of imprisonment; (2) ordered to pay a $100 special assessment; (3) ordered to surrender to the Bureau of Prisons on October 17, 2016; (4) ordered to serve a three-year term of supervised release; (5) ordered to make restitution in the total amount of $4,803,875.40; and (6) subjected to an order of forfeiture for a sum of money equal to $4,803,875.40. (Crim. ECF No. 39). An Amended Judgment, which corrected a clerical error in the restitution amount by adding one cent, for a total of $4,803,875.41, was entered on the docket on September 13, 2016. (Crim. ECF No. 41). Ms. Patel filed her § 2255 motion on September 26, 2017, and later amended. She was subsequently released to home confinement under the First Step Act. (ECF No. 27 at 9).

**G.    The § 2255 Motion**

In her *pro se* memorandum in support of her amended § 2255 motion, Ms. Patel asserts her counsel provided constitutionally ineffective assistance in virtually every respect; and she would have been better off if she had gone to trial or pleaded open and reserved all rights to appeal. (Civ. ECF No. 4-1). Her dissatisfaction with counsel, after accepting the plea agreement, arose out of two unexpected outcomes. The Government intervened in a qui tam civil action under the False Claims Act, which was based, in part, on the same misconduct to

21

which she had pleaded guilty.  (*Id.*, ¶¶ 66-69, 104).  The civil trial judge held that she was estopped from arguing positions that were contrary to the factual stipulations in her guilty plea. (*Id.*)  Thus, she could not argue for a lower damage amount in the civil action, and with treble damages under the False Claims Act, she was found liable for more than $7,000,000.  (*Id.*) Second, her counsel failed to convince the sentencing judge to impose a lower loss amount than recommended in the PSR, and she alleges that her counsel conflated the loss amount with restitution/forfeiture.  (*Id.*, ¶¶ 100, 101, 130).

Ms. Patel asserts that her counsel:  1) failed to conduct a proper pre-plea investigation and secure a more favorable plea deal; 2) failed to explain the pitfalls of joint representation; 3) made misstatements of fact regarding the provisions of the plea agreement; 4) failed to object at the plea hearing; 5) performed deficiently at sentencing; and 6) allowed the Government to violate the terms of the plea agreement.  More specifically, Ms. Patel claims her counsel failed to establish that

- she was not responsible for any losses based on her husband's failure to have proper supervision over Biosound's neurological tests; her husband told her that Biosound was in compliance with Medicare regulations from 2007-2012, with Dr. Tinkelman as the supervisor  (Civ. ECF No. 4-1, ¶ 36(e))

- she was not employed by Biosound from 1999-2010, she was a stay at home mom  (*Id.*, ¶¶ 23-24)

- the plea agreement does not contain a stipulation that she engaged in the charged conduct between the years 2006-2014  (*Id.*, ¶ 106)

- She only became involved in the charged scheme in 2012, when she received a phone call from a referring physician  (*Id.*, ¶¶ 29, 30, 48)

- The only heart tests done were echocardiograms, and all were read by a physician.  (*Id.*, ¶ 38)

- Every vascular test that showed an abnormality was sent to be read by a licensed physician  (*Id.*, ¶¶ 40, 41)

- Every neurological balance test was sent to a Reading Doctor  (*Id.*, ¶ 43)

- The Government's conclusion that 75% of the diagnostic reports contained forged physician signatures was incorrect because all echocardiograms and neurological balance tests were sent to Reading Doctors  (*Id.*, ¶¶ 128, 133)

- Mr. Arleo conflated the restitution and loss Guideline and made her believe a lower loss would be assigned at sentencing  (*Id.*, ¶ 130)

- Her loss amount should have been calculated under U.S.S.G.¶¶ 1B1.3 and 2F1.1  (*Id.*, ¶ 93)[5]

- Mr. Arleo failed to seek a downward departure or lower sentence based on health and other factors  (*Id.*, ¶¶ 158-75)

- The Government breached the plea agreement by obtaining second forfeiture order  (*Id.*, ¶¶ 148-49)

- Her plea was involuntary because she did not know the Government could seek a second forfeiture  (*Id.*, ¶¶ 153-55)

- She would not have accepted the plea offer if she had known the civil action would be filed the next day  (*Id.*, ¶ 157)

## H.    The Answer

The Government contends that Ms. Patel's § 2255 motion is barred by the one-year statute of limitations because it was filed more than one year after the judgment was entered. (Civ. ECF No. 27 at 10).  According to the Government, Ms. Patel's filing within one-year of entry of the amended judgment, which was amended due to a clerical mistake, was untimely. (*Id.*)

In opposition to Ms. Patel's ineffective assistance of counsel claims, the Government presented the affidavit of Frank P. Arleo, Esq. and attached exhibits.  Mr. Arleo states that:  1) he and Attorney Fusco, Mr. Patel's attorney, met with the Patels on June 12, 2014 to discuss joint

---

[5]  This allegation is meritless.  U.S.S.G. § 2B1.1 governs losses for federal health care fraud. *United States v. Opitz*, 704 F. App'x 66, 69 n.7 (3d Cir. 2017).

representation; 2) he explained the joint representation agreement to Ms. Patel; 3) she expressly waived the right to assert conflict of interest; and 4) she never asked to withdraw from joint representation. (Civ. ECF No. 27 at 136-37, ¶ 5). To investigate Ms. Patel's defense, Mr. Arleo unsuccessfully attempted to find Dr. Tinkelman. Based on Mr. Arleo's research, Dr. Tinkelman's testimony would not have mitigated the criminal offense because his involvement, as described by the Patels, did not qualify him as a supervising physician under the Medicare guidelines. (*Id.* at 137, ¶ 6(a)). Mr. Arleo and his law clerk spent forty hours researching the loss amount and other issues. (*Id.* at 137, ¶ 6(c)). Mr. Arleo reviewed the Government's back-up data for its loss calculation, and the Government did not include echocardiogram tests in the losses. (*Id.* at 138, ¶6(c)).

Mr. Arleo engaged in plea negotiations over the course of eighteen months. (Civ. ECF No. 27 at 138, ¶ 7). The Government did not agree that Ms. Patel was less culpable than her husband and would only offer Mr. and Ms. Patel the same plea agreement. (*Id.*, ¶ 7(a)). During plea negotiations, in July 2015, the Government informally stated that it would accept a guilty plea to conspiracy to commit health care fraud, but if the case went to trial, it would pursue other criminal charges, including money laundering. (*Id.* at 139, ¶ 10). Mr. Arleo discussed the informal plea with Ms. Patel. (*Id.*) He described the strengths and weaknesses of the Government's case, and Ms. Patel's sentencing exposure with the plea or without a plea. (*Id.*) He advised her of her absolute right to go to trial. (*Id.*)

During plea negotiations, Mr. Arleo challenged the Government's loss calculation and proposed an alternative, but it was rejected. (*Id.* at 138, ¶ 7(b)). In August 2015, Ms. Patel rejected a proposed plea agreement that included a binding stipulated loss amount. (*Id.*, ¶ 7(c), (d)). Then, Mr. Arleo secured a plea offer that allowed the sentencing judge to determine the

loss amount after hearing the parties' arguments. (*Id.* at 139, ¶ 7(e)). The Government made only two formal plea offers, and Mr. Arleo explained both to Ms. Patel and made sure that she understood. (*Id.*, ¶¶ 8, 9). He was satisfied that Ms. Patel understood the plea agreement that she ultimately accepted. (*Id.* at 140, ¶ 11, 12). He met with Ms. Patel to go over the factual basis questions proposed by the Government in advance of the plea hearing. (*Id.*, ¶ 13).

After the Court accepted Ms. Patel's guilty plea, Mr. Arleo met with her twice to discuss the presentence report and to prepare for sentencing. (*Id.*, ¶ 14). He advised Ms. Patel that the Government was going to argue that she should not get a three-point reduction in the base offense level for acceptance of responsibility, because she had taken an inconsistent position in a related civil case. (*Id.*) Mr. Arleo advised Ms. Patel of the pros and cons of the legal position she took in the civil case, and its effect on her criminal case. (Civ. ECF No. 27 at 140, ¶ 14). He confirmed in writing that Ms. Patel had chosen to accept responsibility for her wrongful conduct in the criminal case, despite any consequences to her civil action. (*Id.*, ¶ 15). Ms. Patel never requested an interpreter for any of their consultations. (*Id.* at 141, ¶ 17).

## I.   Reply Brief

In her reply brief, Ms. Patel contends that her § 2255 petition was timely, and that even if it was not, she should be entitled to equitable tolling based on her serious medical condition, and her need to rely on her children as English interpreters. (Civ. ECF No. 53 at 2-7). She described the gravamen of her petition was that Mr. Arleo erred in advising her to stipulate to the gross amount the Patels received under the scheme to defraud, without investigating, verifying or challenging that amount before she signed the plea agreement, and that he incorrectly advised her she could challenge the loss amount later. (*Id.* at 7-8). She also contends that Mr. Arleo made no effort to distinguish between Medicare's requirement for a neurologist to supervise neurological

testing, and the requirements of private insurance companies.  (*Id.* at 8).  Further, she argues that

once Mr. Arleo had the PSR and the documents supporting the Government's loss calculation, he

should have used those records to challenge the loss amount.  (*Id.*)  Finally, she asserts that Mr.

Arleo failed to support the loss theory at sentencing by establishing there were legitimate services

provided by Biosound and Heart Solution.  (*Id.* at 9).  But for these errors by counsel, Ms. Patel

submits that she would have gone to trial or pleaded open to preserve her appellate rights and retain

her ability to challenge damages in a civil action.  Ms. Patel also requests a hearing to determine

whether the Government withheld or destroyed a document identified as "Proper Loss Calculation

Memo" in response to Mr. Patel's FOIA request.  This Court will deny the request for an

evidentiary hearing on this issue because the Government described to the U.S. Probation Office

how it calculated the loss amount, as reflected in the PSR ¶¶ 28-42, and provided the backup data

for the loss calculation to the defense before sentencing.

**J.      Request to supplement the reply brief**

In her reply brief to the Government's answer, Ms. Patel requested an extension of time to

supplement her brief in further support of her § 2255 motion.  (Civ. ECF No. 53 at 12).  She

submits that her serious health condition precluded her from assisting counsel in preparing a

timely declaration and supporting evidence.  (*Id.* at 12-13).  The Government did not respond,

and Ms. Patel submitted a supplemental motion for an evidentiary hearing (Civ. ECF No. 54),

together with her declaration in support of her reply brief, and the declaration of an investigator

whom she hired to interview witnesses and obtain information about the Government's loss

calculation.

Ms. Patel's request for yet another extension of time for briefing is not supported by good

cause.  Ms. Patel filed her original § 2255 motion in September 2017.  She was given an

extension of time to submit a second amended § 2255 motion on or before May 30, 2018, but ultimately did not do so.  (Civ. ECF Nos. 9, 10).  The Government did not file its full answer to her amended § 2255 motion until June 15, 2020.  (Civ. ECF No. 16).  At that point, Ms. Patel had three years to provide a declaration in support of her § 2555 motion, including her claim that the Government's loss amount was grossly inflated.  Nonetheless, this Court granted a stay of approximately fifteen months while the Patels pursued documents regarding the Government's loss calculation through a FOIA request.  (Civ. ECF Nos. 29, 38, 40).  This Court granted Ms. Patel two extensions of time to file her reply brief, which was ultimately filed on May 16, 2022, without a declaration in support of her loss argument.  (Civ. ECF Nos. 50, 52, 53).  Ms. Patel had five years to discover support for her claim that counsel was ineffective for failing to establish the Government's loss calculation was grossly inflated, and expanding the record at this time is unwarranted.  This Court denies her supplemental motion for hearing (Civ. ECF No. 54) and her request for an evidentiary hearing, because the record conclusively shows that she is not entitled to relief on her ineffective assistance of counsel claims.  28 U.S.C. § 2255(b).

## II.   **Statute of Limitations and Equitable Tolling**

When a federal defendant elects not to file a direct appeal, she must file a motion under 28 U.S.C. § 2255 within one year and fourteen days after the judgment of conviction was entered.  *See* Fed. R. App. P. 4(b)(1); *Kapral v. United States*, 166 F.3d 565, 577 (3d Cir. 1999).  Judgment was initially entered on August 16, 2016, and Ms. Patel did not file a notice of appeal.  According to the Government, Ms. Patel's motion is time-barred because she filed her original § 2255 motion one year after the amended judgment was filed, more than one year after judgment was initially entered.  (Civ. ECF No. 27 at 10).  In her reply brief, Ms. Patel claims that the statute of limitations restarted on September 13, 2016, the date an amended judgment was entered to correct a clerical

error in the amount of restitution. (Civ. ECF No. 53 at 3). If the amended judgment restarted the limitations period, she submits that her filing was timely. (*Id.*)

The Third Circuit has not addressed the question of whether an amended judgment that merely corrects a clerical error in the original judgment restarts the one-year statute of limitations for a motion under 28 U.S.C. § 2255. The Tenth and Eleventh Circuits have held that when an amended judgment is ministerial in nature, it does not restart the one-year statute of limitations period. *United States v. Prado-Diaz*, 434 F. App'x 763, 765 (10th Cir. 2011); *Borgesano v. United States*, No. 20-11453, 2021 WL 2879696, at *4 (11th Cir. July 9, 2021); *see also Marmolejos v. U.S.*, 789 F.3d 66, (2nd Cir. 2015) (amended judgment correcting clerical errors is not a new judgment for purposes of second or successive requirements under 28 U.S.C. § 2255(h)). This Court agrees with the Tenth and Eleventh Circuits, and therefore, turns to the question of equitable tolling.

The one-year statute of limitations under § 2255 is not jurisdictional, and is, therefore, subject to equitable tolling. *Miller v. N.J. State Dep't of Corr.*, 145 F.3d 616, 617–18 (3d Cir. 1998). For equitable tolling to apply, the petitioner "bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005). Therefore, Ms. Patel must explain how she was prevented from asserting her rights, and that she pursued her rights diligently. *LaCava v. Kyler*, 398 F.3d 271, 276 (3d Cir. 2005).

Ms. Patel surrendered to federal prison on October 27, 2016, just days after having major surgery. (Civ. ECF No. 53 at 6). Almost immediately, she began to suffer progressive symptoms that affected her ability to complete her *pro se* § 2255 motion. (Civ. ECF No. 53-1, ¶¶ 5-7). Further, Ms. Patel speaks limited English. (*Id.*, ¶ 3). She prepared her § 2255 motion with

28

translation assistance from her children.  (*Id.*, ¶ 4).

The Third Circuit has held "that inability to read or understand English, combined with denial of access to translation or legal assistance, can constitute extraordinary circumstances that trigger equitable tolling…  the relevant inquiry is…  how severe an obstacle it creates with respect to meeting" the one-year statute of limitations.  *Pabon v. Mahanoy*, 654 F.3d 385, 400–01 (3d Cir. 2011).  Ms. Patel's serious medical condition during the one-year statute of limitations period, combined with her need to obtain outside translation services from her children to prepare the motion while incarcerated, are extraordinary circumstances that trigger equitable tolling.

Ms. Patel must also show that she nonetheless "exercised reasonable diligence in… bringing [the] claims."  *Miller*, 145 F.3d at 618–19 (quoting *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1126 (3d Cir. 1997); *see also Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96 (1990)).  While due diligence "does not require 'the maximum feasible diligence,'… it does require reasonable diligence in the circumstances."  *Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004) (citations omitted).  Determining whether Ms. Patel has exercised "reasonable diligence…  depends on the circumstances faced by the particular petitioner."  *Munchinski v. Wilson*, 694 F.3d 308, 331 (3d Cir. 2012); *see also Wilson v. Beard*, 426 F.3d 653, 661 (3d Cir. 2005) ("The fact that we require a petitioner in one situation to undertake certain actions does not necessitate that we impose the same burden on all petitioners" because "whether a habeas petitioner has exercised due diligence is context-specific.")

Ms. Patel's *pro se* § 2255 motion was filed only 20 days late.  This short delay, considering her ill-health and need for translation services, establishes the reasonable diligence required for equitable tolling of the statute of limitations.  Therefore, this Court will address the merits of Ms. Patel's amended § 2255 motion.

III.     DISCUSSION

A.     Legal Standard

A prisoner in federal custody may file a motion under 28 U.S.C. § 2255 to challenge the

validity of his or her conviction and sentence.  Section 2255 provides, in relevant part:

> A prisoner in custody under sentence of a court established by Act
> of Congress claiming the right to be released upon the ground that
> the sentence was imposed in violation of the Constitution or laws of
> the United States, or that the court was without jurisdiction to
> impose such a sentence, or that the sentence was in excess of the
> maximum authorized by law, or is otherwise subject to collateral
> attack, may move the court which imposed the sentence to vacate,
> set aside or correct the sentence.

28 U.S.C. § 2255.

The Third Circuit has summarized the legal standard for bringing a Sixth Amendment

ineffective assistance of counsel claim, first announced by the Supreme Court in *Strickland v.*

*Washington*, 466 U.S. 668 (1984):

> a criminal defendant may demonstrate that his representation was
> constitutionally inadequate by proving: (1) that his attorney's
> performance was deficient, i.e., unreasonable under prevailing
> professional standards; and (2) that he was prejudiced by the
> attorney's performance. Under the first prong, judicial scrutiny is
> highly deferential, and courts must indulge a strong presumption
> that counsel's conduct falls within the wide range of reasonable
> professional assistance. In order to establish prejudice, the defendant
> must prove that there is a reasonable probability that, but for
> counsel's unprofessional errors, the result of the proceeding would
> have been different. We have endorsed the practical suggestion in
> *Strickland* to consider the prejudice prong before examining the
> performance of counsel prong because this course of action is less
> burdensome to defense counsel.

*United States v. Booth*, 432 F.3d 542, 546 (3d Cir. 2005) (internal quotations, alterations and

citations omitted).  The same test applies to advice given by counsel in the context of guilty plea

discussions.  *Id.* (citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)).  In such cases, the petitioner

must establish "that but for his trial attorney's alleged ineffectiveness, he would likely have received a lower sentence." *Id.* at 547. Alternately, a petitioner may establish prejudice by showing "that but for his counsel's purported errors, he would have gone to trial, received a more favorable plea deal, or have been better off pleading guilty without the benefit of a plea agreement." *Boye v. United States*, 810 F. App'x 118, 121 (3d Cir. 2020).

**B.      Whether counsel was ineffective by engaging in joint representation**

Ms. Patel claims that her counsel provided constitutionally ineffective assistance because he failed to advise her of possible conflicts of interest arising from joint representation with her husband and his counsel. (Civ. ECF No. 4-1, ¶¶ 55–56.) In every meeting with her counsel, her husband was present. (*Id.*, ¶ 54). Her counsel never advised her of the pitfalls of entering into a joint defense with her husband. (*Id.*, ¶ 47). He failed to advise her of safety valve provisions and the possibility of a cooperation agreement. (Civ. ECF No. 4-1, ¶ 54). On January 25, 2014, her husband appeared at a proffer session with Attorney Anthony Fusco ("Fusco") and representatives for the Government. (*Id.*, ¶ 50). Ms. Patel was not advised of the conflict of interest this created when her husband's proffer statement incriminated her and was used against her at sentencing. (*Id.*, ¶¶ 51-53). The plea agreement contained a stipulated loss figure that included losses prior to the date of her knowledge or involvement in the criminal conduct. (*Id.*, ¶ 57).

In opposition, the Government submitted the affidavit of Ms. Patel's counsel, Frank Arleo, Esq. ("Arleo Aff."). (Civ. ECF No. 27 at 136-41). Mr. Arleo represented that he and co-counsel Anthony Fusco met with the Patels for the first time on June 12, 2014. (*Id.* at 136-37, ¶ 5). They discussed the possibility of joint representation and explained the contents of the joint defense agreement. (*Id.*) The joint defense agreement provides that "[b]y entering into the Agreement, each party knowingly and expressly waives the right to raise a conflict of interest based on the

terms of the Agreement" and "[e]ach party is free to withdraw at any time, with or without reason, from the Agreement upon giving express prior written notification to each of the parties…..") (*Id.* at 144). Ms. Patel never expressed a desire to withdraw from joint representation. (*Id.* at 136-37, ¶ 5). In reply, Ms. Patel contends that Mr. Arleo did not make any effort to distinguish her responsibility for losses from her husband's, even though his criminal conduct predated hers, and she could not be held responsible for any losses prior to 2012. (Civ. ECF No. 53 at 7, n. 2).

"The Sixth Amendment requires counsel to avoid conflicts of interest in order to fulfill the duty of loyalty owed to the client." *United States v. Santarelli*, 604 F. App'x 164, 166 (3d Cir. 2015) (citing *Strickland,* 466 U.S. at 688). To establish ineffective assistance of counsel, a defendant must establish an actual conflict of interest. *Id.* "An actual conflict of interest 'is evidenced if, during the course of the representation, the defendants' interests diverge with respect to a material factual or legal issue or to a course of action.'" *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988) (quoting *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983)). "Accordingly, [a petitioner] must prove that 'some plausible alternative defense strategy or tactic might have been pursued' and that 'the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.'" *Id.* (quoting *United States v. Fahey*, 769 F.2d 829, 836 (1st Cir. 1985)). "[A]n actual conflict of interest is more likely to be found where 'an attorney takes positive steps on behalf of one client prejudicial to another[.]'" *Santarelli*, 604 F. App'x at 167.

Based on Mr. Arleo's affidavit and submission of the joint representation agreement, the record establishes that Ms. Patel was advised of the potential for conflict arising from joint representation, and that she was free to change her mind at any time and withdraw. Significantly, Mr. Arleo wrote in a memorandum dated January 20, 2015, that the Government, believing both

defendants were equally culpable, was not willing to enter into a plea agreement unless both defendants accepted equal responsibility for the scheme to defraud, and that they would receive the same plea agreement.  (Civ. ECF No. 27, ¶¶ 150, 178).  To secure the identical plea agreements, Mr. Patel made a proffer statement to the Government.  At the plea hearing, Ms. Patel was advised that she could refuse to plead guilty and retain all her rights, but she did not choose to do so.

The Patels obtained a benefit from the plea agreement because the Government agreed not to pursue any other charges arising out of the conduct described in the Information.  Ms. Patel suffered no prejudice arising from joint representation because her interests were aligned with her husband, and the Government had a strong case for holding both equally responsible, based in part on her confession to forging physician signatures, and because she shared in the lavish lifestyle from the proceeds of the fraudulent scheme.  *Santarelli*, 604 F. App'x at 167–68 (where husband and wife presented uniform defense theory and did not deter from it, conflict of interest claim was implausible).  Therefore, this ineffective assistance of counsel claim fails.

**C.      Whether counsel was ineffective by not obtaining services of an interpreter for consultations with Ms. Patel**

Ms. Patel, who speaks Gujarati and limited English, claims that her counsel provided ineffective assistance because he did not provide her with an interpreter for any of their consultations, although she used the services of an interpreter at the plea hearing and sentencing hearing.  The Government submitted Mr. Arleo's sworn affidavit that Ms. Patel never requested an interpreter, and Mr. Patel was available to interpret during all consultations.  (Civ. ECF No. 27, ¶¶ 17, 22-24).  Ms. Patel did not address this in her reply brief.  (Civ. ECF No. 53).

The records shows that Ms. Patel had many opportunities to voice any questions or misunderstandings during her plea colloquy, with assistance of an interpreter, and she did not voice any concerns.  (Crim. ECF No. 31).  Instead, she fully affirmed her understanding and desire to

33

plead guilty to the terms that were described and translated for her at the plea hearing. An interpreter was available at her sentencing as well. (Crim. ECF No. 27 at 67).  Ms. Patel has failed to establish that she suffered  any prejudice from counsel's failure to provide an interpreter during her attorney consultations.  *United States v. Mendez*, 282 F. App'x 153, 156 (3d Cir. 2008) (holding that a court's use of an interpreter at a sentencing hearing did not alter the fact that the defendant confirmed his understanding in English and never demonstrated any difficulty in comprehension). Therefore, this ineffective assistance of counsel claim fails on both prongs of the *Strickland* test.

**D.     Whether counsel was ineffective in pre-plea investigation and plea negotiations**

Ms. Patel contends that her counsel was ineffective in his pre-plea investigation and plea negotiations.  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Shotts v. Wetzel*, 724 F.3d 364, 375 (3d Cir. 2013) (quoting *Strickland*, 466 U.S. at 690–91)).  Deference to counsel's judgment is particularly important in the plea context.  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

> In the case of an early plea, neither the prosecution nor the defense may know with much certainty what course the case may take. It follows that each side, of necessity, risks consequences that may arise from contingencies or circumstances yet unperceived. The absence of a developed or an extensive record and the circumstance that neither the prosecution nor the defense case has been well defined create a particular risk that an after-the-fact assessment will run counter to the deference that must be accorded counsel's judgment and perspective when the plea was negotiated, offered, and entered.

*Premo v. Moore*, 562 U.S. 115, 126 (2011).

According to the PSR, Ms. Patel was arrested on June 4, 2014, and confessed to health care fraud after a search of Biosound's office in Parsippany, New Jersey uncovered materials she used to forge physician signatures on Biosound's and Heart Solution's diagnostic reports.  The Government had interviewed Biosound employees who were aware of the fraud.  Ms. Patel asserts

that her counsel failed to argue she was a stay at home mom with limited involvement in the scheme to defraud. However, based on her confession, there was risk that a jury would not credit Ms. Patel's testimony of limited involvement and knowledge of the fraud, particularly because she enjoyed the lavish lifestyle that resulted from the fraudulent scheme. Time was of the essence in obtaining a plea deal because the more time and effort the Government spent in prosecuting the case, the less reason it had to accept a plea. There was no guarantee that the Government would not bring additional charges for money laundering, as suggested in early plea negotiations. Thus, it was objectively reasonable for counsel to forego a time-consuming pre-plea investigation of the loss amount, which would require review of thousands of diagnostic reports against Reading Doctors' records, which the Government had already undertaken to obtain a reasonable estimate of losses. Without a plea, conviction was likely, and the Court was required to determine only a reasonable estimate of the losses under Application Note 3(C) to U.S.S.G. § 2B1.1.

Without further explanation, Ms. Patel claims that she learned of a better plea offer that her counsel never disclosed to her. The Government denies this, and Mr. Arleo submitted that he conveyed the two formal plea offers made by the Government, and also discussed an informal offer with Ms. Patel. Mr. Arleo's records of the plea negotiations support his denial of her claim.

Additionally, Mr. Arleo did not blindly accept the Government's $4.3 million loss calculation during plea negotiations. He proposed an alternative loss amount under $100,000. His loss theory was supported by Application Note 3(E)(i) to U.S.S.G. § 2B1.1, which provides:

> Loss shall be reduced by the following:
>
> (i) The money returned, and the fair market value of the property returned **and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.**

(emphasis added). Ultimately, the U.S. Probation Office recommended that Ms. Patel not receive

such credit for services provided, pursuant to Application Note 3(F)(v), which states:

> In a case involving a scheme in which (I) services were fraudulently rendered to the victim **by persons falsely posing as licensed professionals**; . . . **loss shall include the amount paid** for the property, services or goods transferred, rendered, or misrepresented, **with no credit provided for the value of those items or services.**

(emphasis added).  Whether Ms. Patel's role in the forgeries of physician signatures and her failure to have a neurological supervisor for Biosound equated to falsely posing as a licensed professional was subject to reasonable dispute, and the Guidelines are advisory in nature.  Therefore, it was objectively reasonable for Mr. Arleo to argue for a lower loss amount based on the value of performing the diagnostic tests.  When Mr. Arleo could not obtain a more favorable plea agreement from the Government and the offer was about to expire, Mr. Arleo recommended that Ms. Patel stipulate to the gross proceeds received from the scheme to defraud but retain the right to argue for a lower loss amount at sentencing.

Ms. Patel now believes she may have been better off going to trial or pleading open because Mr. Arleo failed to convince the sentencing judge to adopt a lower loss amount.  The *Strickland* standard, however, precludes viewing counsel's performance in hindsight.   Mr. Arleo's preservation of the right to argue for a lower loss amount at sentencing, while retaining the possibility of a reduction for acceptance of responsibility and a guarantee of no additional charges, was objectively reasonable.  Ms. Patel has not presented an alternative loss theory available to Mr. Arleo at that time, which was more likely to result in a lower loss amount.  The Government had obtained the loss amount directly from the insurers and compared this against records from most of the Reading Doctors whose signatures were forged.  The losses did not include diagnostic reports for echocardiograms because the Government was aware that all echocardiograms were sent to Reading Doctors.  The payments for all neurological tests were included in the losses

because the tests were not supervised by a neurologist. Therefore, this claim of ineffective assistance of counsel in pre-plea investigation and plea negotiations fails both prongs of the *Strickland* test.

**E.     Whether ineffective assistance of counsel resulted in an unknowing and involuntary plea**

Ms. Patel contends that her counsel misstated the terms of the plea agreement by telling her that she could challenge the loss amount at sentencing, and that the forfeiture order would be limited to the loss amount determined by the sentencing judge. This was not a misstatement, the plea agreement permitted Ms. Patel to challenge the loss amount, and limited the forfeiture to the loss amount determined by the sentencing judge. Next, she contends that counsel failed to inform her that the plea agreement permitted the Government to seek additional forfeiture in another proceeding, referring to the False Claims Act litigation.

To satisfy due process, a guilty plea must be voluntary, knowing, and intelligent. *Boykin v. Alabama*, 395 U.S. 238, 243 (1969); *Jamison v. Klem*, 544 F.3d 266, 274 (3d Cir. 2008). Here, the plea agreement contained a provision advising Ms. Patel that the Government was not precluded from initiating and prosecuting a civil action, and she affirmed her understanding of this provision in the plea hearing. This cured any error in failing to advise Ms. Patel of the consequences of her guilty plea on civil litigation. *See, e.g.*, *United States v. Fazio*, 795 F.3d 421, 428 (3d Cir. 2015) (any error in failing to advise defendant that guilty plea would subject him to automatic immigration removal was cured by in-depth colloquy and language of the plea agreement). Ms. Patel accepted the risk that she could be found liable for any damages permitted in a civil action. Moreover, there is evidence the Patels were considering "a global resolution" during plea negotiations. (Civ. ECF No. 27 at 181). Mr. Arleo memorialized this in a letter dated April 15, 2016,

> Regarding the civil claims, we were not able to reach a global
> resolution of those claims. As a result, the Government filed a civil
> action asserting claims under the False Claims Act. After we filed
> our Answer denying the allegations of the Complaint, the
> Government filed a Motion for Summary Judgment. In that Motion,
> the Government argues that it is entitled to judgment since you
> previously admitted in the criminal action that there was no
> neurological supervision. The Government also argues that you are
> not permitted to argue the contrary position that we asserted in our
> papers in opposition to the Government's Motion, which claimed
> supervision for at least some of the years.

(Civ. ECF No. 27 at 184).  Mr. Arleo advised that if Ms. Patel pleaded guilty because they did not

have a "valid" neurological supervisor for Biosound during the relevant time period, this could

result in losing the motion for summary judgment in the civil action and being exposed to treble

damages, but she would retain the argument for a three-point reduction in her base offense level

for acceptance of responsibility.  (Civ. ECF No. 27 at 184).  Mr. Arleo stated,

> After discussing all of the above in great detail at our April 5, 2016
> meeting, it is my understanding that you do not wish to alter your
> position in the civil case that there was a valid neurological
> supervisor during at least some portion of the relevant time period.
> You have indicated that you feel strongly that you are correct in your
> position on this issue and that you fully understand the risks of
> proceeding in this fashion. Accordingly, I will advise the
> Government that you do not wish to change the legal position
> asserted in our opposition to the Government's Summary Judgment
> Motion. In addition, if the Government argues that you are not
> entitled to a 3 point reduction for acceptance of responsibility in the
> criminal action we will intend to fight that as well.

(Civ. ECF No. 27 at 184-85).  Mr. Arleo's letter to Ms. Patel establishes her knowing, intelligent

and voluntary entry of her guilty plea at the hearing before the Court, while she still had the

opportunity to go to trial instead.  This claim of ineffective assistance of counsel fails because

counsel's performance was not objectively unreasonable under the circumstances as they existed

before the plea hearing.

**F.      Whether counsel provided ineffective assistance at the plea hearing**

Ms. Patel asserts that her counsel provided ineffective assistance at the plea hearing by allowing her to answer "yes" to ambiguous factual basis questions, which caused her to falsely admit to her involvement in the fraudulent scheme from 2006 to 2014, and to the amount of money received from Medicare and private insurance companies.  Solemn declarations in open court, such as those made in a plea hearing, "carry a strong presumption of verity[,]" and constitute a "formidable barrier" in collateral proceedings.  *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).

To begin, Ms. Patel had the services of an interpreter at the plea hearing.  Therefore, language was not a barrier to her understanding.  The factual basis questions for the plea colloquy, quoted in Section I.C *supra*, were not ambiguous.  The questions were designed to satisfy the sentencing judge of Ms. Patel's guilt of the one count charged in the Information, as she had agreed in the written plea agreement.  The time period of the fraudulent scheme, 2006 to 2014, was clearly stated in the Information, the plea agreement, and in the factual basis questions at the plea hearing. Judge Walls advised Ms. Patel:

> you should know that you are under no obligation to plead guilty to the charge. You have a right to have the matter referred to the grand jury. A grand jury will hear the evidence presented to it by the Government and decide whether you should be formally charged with a crime.

(Crim. ECF No. 31 at 5-6).  Ms. Patel verbally acknowledged that she understood.  Judge Walls told Ms. Patel, "if I say anything that does not accord with your understanding, please let me know."  After advising Ms. Patel of her rights, Judge Walls asked whether she still wanted to plead guilty, and she affirmed.  If Ms. Patel was not involved in the scheme for the time period alleged, she had every opportunity to interject.

Moreover, Mr. Arleo went over the factual basis questions with Ms. Patel in advance of

the plea hearing.  They discussed the issue of whether Biosound had a supervising neurologist during the relevant period, and the factual basis question was revised because the Patels said they had hired Dr. Tinkelman as a neurological supervisor.  After having this discussion, Mr. Arleo confirmed in a letter to Ms. Patel that she agreed to answer "yes" to the revised question at the plea hearing because Dr. Tinkelman did not provide the proper supervision that Medicare required.  She made this decision because she wanted to receive a reduction in offense level for acceptance of responsibility and still defend the False Claims Act litigation.  The record establishes that counsel's performance in advising Ms. Patel concerning the factual basis questions was objectively reasonable, and any misunderstandings by Ms. Patel were cured by the plea colloquy.  Therefore, this ineffective assistance of counsel claim fails.

## G.   Whether counsel provided ineffective assistance at sentencing

Ms. Patel maintains that her counsel's performance at the sentencing hearing was deficient because he relied on a meritless loss theory rather than arguing that she was not individually responsible for most of the losses, and that the Government inflated the loss calculation.  The record does not support this allegation.  First, the Government did not include payments by insurers for any echocardiograms in the loss calculation, as Ms. Patel suggests. (*see* Civ. ECF No. 4-1 at 10, ¶ 38 and PSR, ¶ 32).  The Government recognized that not all of the diagnostic reports were forged and undertook a laborious review of thousands of records to obtain a reasonable estimate of losses from the scheme to defraud.  With this background, Mr. Arleo strenuously advocated that Ms. Patel was less culpable than her husband, and she should not be responsible for any losses from neurological diagnostic tests because she was not an owner or manager of Biosound, and for much of the time, she was a stay at home mom.  This argument, if successful, would have reduced Ms. Patel's loss amount by approximately half.  The restitution and forfeiture amounts, per the plea

agreement, would be equal to the loss amount.

Significantly, however, the Government explained that many of the neurological diagnostic reports also contained forged physician signatures.  Thus, liability was not premised solely on failing to have proper supervision by a neurologist.  The sentencing judge was persuaded by the Government's argument that the Patels jointly operated Heart Solution and Biosound, and jointly profited from their wrongdoing.  He referred to Biosound and Heart Solution as a "mom and pop shop."

Contrary to Ms. Patel's allegations, Mr. Arleo submitted that Biosound and Heart Solution provided legitimate services to the patients involved by performing the diagnostic testing and preparing preliminary reports.  The only missing element was having a Reading Doctor review and interpret the reports that had been prepared.  Mr. Arleo justified this argument by stressing that the Patels had cooperated with the Government in identifying all patients who were affected, which allowed those at risk to follow up with their medical providers.  It was determined that no one had been injured by the scheme to defraud.  Although rejected by the sentencing judge, the argument had support in the advisory Sentencing Guidelines, and in precedent cited by Mr. Arleo in the sentencing memorandum.  Further, it was only part of the loss argument he presented.  The assistance of counsel guaranteed by the Sixth Amendment requires no more.

Ms. Patel's claim that her counsel failed to seek a downward departure based on her poor health and other factors is inaccurate.  Mr. Arleo argued that her offense level should be reduced based on her serious medical condition, which required treatment that could not be provided in prison.  He further argued she was otherwise a good, charitable person, who simply made a mistake.  The sentencing judge disagreed, but this does not make counsel's performance constitutionally deficient.

To establish ineffective assistance of counsel at sentencing, the petitioner must also establish the reasonable probability of a shorter sentence but for counsel's errors. *United States v. Smack*, 347 F.3d 533, 540 (3d Cir. 2003) (citing *Glover v. U.S.*, 531 U.S. 198, 204 (2001) (holding that any reduction in sentence constitutes substantial prejudice for purposes of the *Strickland* analysis)). Even if this Court were to assume counsel's performance was constitutionally deficient, Ms. Patel has not shown that a more in depth review of the payments by the insurers would have resulted in a successful claim for a lower offense level. The sentencing judge added 18 points to her base offense level based on a loss of $4,803.875.40. The relevant Guideline called for an increase of 18 points to the base offense level for losses between $3,500,000 and $9,000,000. U.S.S.G. § 2B1.1(b)(1)(J, K); (PSR ¶ 51). To reduce the offense level by one point, the loss amount had to be under $3,500,000. Ms. Patel fell far short of her burden to establish prejudice from counsel's failure to make this showing. *See Boye v. United States*, 810 F. App'x 118, 121 (3d Cir. 2020) (holding the petitioner failed to set forth a lower loss calculation "to show that his sentence would have been materially impacted, or that he would have been on stronger plea bargaining grounds.") Therefore, this ineffective assistance of counsel claim fails on both prongs.

## IV.   CONCLUSION

Based on the record as a whole, Ms. Patels' ineffective assistance of counsel claims amount to nothing more than her belief that, in hindsight, she would have been better off if her counsel had pursued a different strategy from the beginning. "[I]t is critical that courts be 'highly deferential' to counsel's reasonable strategic decisions and guard against the temptation to engage in hindsight." *Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002) (quoting *Strickland*, 466 U.S. at 689–90)). As discussed above, counsel's strategic choices throughout his representation of Ms. Patel were objectively reasonable under the circumstances, her plea was knowing,

intelligent and voluntary, and she failed to establish prejudice from counsel's performance at any stage.

**V.      CERTIFICATE OF APPEALABILITY**

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right."  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Because jurists of reason could not disagree with this Court's conclusion that Ms. Patel's Sixth Amendment ineffective assistance of counsel claims are without merit, she has failed to make a substantial showing of the denial of a constitutional right, and no certificate of appealability shall issue.

An appropriate order follows.

Date: _____December 22_____, 2022

_____
Hon. Susan D. Wigenton,
United States District Judge